NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0353n.06

No. 25-1776

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 06, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JERREECE NOEL, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CHALLENGE MANUFACTURING | ) | MICHIGAN |
| HOLDINGS, INC., | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge.    Jerreece Noel alleges that her employer, Challenge Manufacturing Holdings, treated her unfairly because of her race and sex. Things reached a breaking point when Challenge put Noel on a performance improvement plan. She quit but claimed that the company constructively discharged her. Noel later sued Challenge for engaging in race and sex discrimination, retaliating against her because she filed a discrimination charge, and creating a hostile work environment. The district court correctly rejected these claims on summary judgment. Noel lacks evidence that Challenge's neutral reasons for its actions—her attendance and performance issues—were pretextual. That failure dooms her discrimination and retaliation claims. And Noel forfeited her hostile-work-environment claims because she did not dispute one of the district court's two alternative grounds for rejecting them. We affirm.

I

Challenge manufactures automotive parts and sells them to others in the auto industry. It operates many plants throughout the country, including one in Pontiac, Michigan. Noel worked in Challenge's HR department at this Pontiac plant from February 2022 to August 2023.

The parties differ on what happened during Noel's time at Challenge. Challenge maintains that Noel struggled to show up on time (or at all) and did not meet performance expectations once it promoted her. Noel maintains that her boss and coworkers discriminated against her because she is an African American female and because she complained about that discrimination. This case's procedural posture requires us to resolve all genuine disputes of material fact in the light most favorable to Noel. *See Howell v. McCormick*, 148 F.4th 834, 843 (6th Cir. 2025). We will retell the events with this summary-judgment standard in mind.

HR Manager Cheryl Brainard interviewed Noel and hired her as a talent acquisition specialist at Challenge's Pontiac plant. Noel reported to Brainard and worked alongside Jackson Mahle and Iris Kote (among others). As a talent acquisition specialist, Noel recruited candidates to fill "the different roles" at the plant from the company's internal pool of employees and from external sources. Noel Dep., R.19-2, PageID 187–89. Noel enjoyed the work at first, got along with Brainard and her coworkers, and even received a substantial cost-of-living raise (from $52,500 to $65,000) a few months into the job.

After Noel received this raise, though, Brainard's attitude toward her changed. Noel felt that Brainard always spoke to her last and used a "lower tone" (and "louder" "voice") when doing so. *Id.*, PageID 198. Sometimes Brainard even "yelled" at Noel. *Id.*, PageID 199. Noel believed she received this poor treatment because she "was African American." *Id.* Noel's suspicions of discrimination grew even more when she overheard Brainard talk about some African American

2

production workers as if "they were dumb[.]" *Id.*, PageID 198–99. At one point, Brainard also told Noel "not to hire people from Pontiac" even though the plant was located there. *Id.*, PageID 247, 249. Noel found this instruction "discriminatory" because "Pontiac is primarily made up of African American people." *Id.*, PageID 246–47.

Noel also gave two examples of Brainard's mistreatment. To start, Challenge's HR department held a job fair in June 2022 at a hotel in Sterling Heights, Michigan. Kote, Mahle, and Noel attended the fair. But "hardly anybody" showed up for interviews. *Id.*, PageID 212. Due to the lack of interest, Brainard allowed Noel to leave at 2:00 p.m. rather than stay for the fair's remaining two hours. Brainard chose Noel to go home early because Noel was the "least senior" employee and she thought Noel would rather take the "afternoon off" than sit around with "nothing to do" at the fair. Brainard Dep., R.19-4, PageID 437, 441. After Noel left, however, a photographer arrived to take pictures of the event. Noel later found out about the photographer. She surmised that Brainard had asked her to leave so the corporate photos would include only white employees. Noel thus confronted Brainard. But Brainard responded that she did not know the photographer planned to show up. And the only photo in the record from this event is of Kote and the hotel's manager (an African American woman).

Next, Brainard held a July meeting with Kote and Noel about their work schedules soon after the job fair. Brainard told Kote that her standard workday would run from 8 a.m. to 5 p.m. but that she could work from 7:30 a.m. to 4:30 p.m. when needed. Yet Brainard told Noel that she had to work a later schedule: her standard day would run from 8:30 a.m. to 5:30 p.m. and she could work 8 a.m. to 5 p.m. when needed. Noel complained about Kote's ability to arrive at 7:30 a.m. because Brainard had rejected Noel's prior request to work before 8 a.m. on the ground that

recruiters could not call candidates before then.  In response, Brainard allegedly yelled at Noel: "If you're not happy, you can leave if you want to!"  Email, R.19-8, PageID 589.

On July 1, Noel emailed Ken Savage, the HR Vice President, about the "unfair treatment" from Brainard.  *Id.*, PageID 589–90.  She expressed frustration that Kote could arrive earlier than her and that she missed the photo opportunity.  Her email, though, did not mention race or sex discrimination.

Within the hour, Savage emailed Noel back "apologizing that [she felt] this way" and reiterating Challenge's policies requiring employees to treat each other "with respect."  *Id.*, PageID 588.  Later that month, Savage visited the Pontiac plant to investigate.  While there, he interviewed Noel, Brainard, Kote, and Mahle.  After these conversations (along with additional conversations with the marketing department), Savage concluded that Brainard had not sent Noel home to exclude her from any photos.  Savage followed up with Noel about this conclusion.  And when Kote quit a short time later, Brainard let Noel take the 8 a.m. to 5 p.m. shift that she desired.

Noel's complaints also did not deter Brainard from recommending her for a promotion to an HR generalist position in August 2022.  The promotion came with a salary increase to $70,000.  Among this job's duties, an HR generalist must track the "attendance points" of employees who work on the plant floor.  Savage Decl., R.19-9, PageID 595.  This responsibility was "crucial" to Challenge's "efficient operations" because the company could not discipline these employees for violating its attendance rules under the collective bargaining agreement unless it timely notified them.  *Id.*

Noel started her new role in late October.  The transition did not go smoothly.  When Noel switched roles, she had to switch desks—closer to the other HR generalists.  Brainard told Noel to switch to a small workstation that made her feel "claustrophobic," so Noel asked to either "remain

at [her] desk by the window" or move to a larger "office in the hallway[.]" Email, R.19-14, PageID 615. Brainard responded by "yelling" at Noel and questioning whether she wanted to remain "a recruiter" rather than transition to HR generalist. Noel Dep., R.19-2, PageID 291. Brainard ultimately gave Noel two options: either move to the smaller space or take the hallway desk and serve as a "liaison" for employees. Email, R.19-14, PageID 614. The hallway desk came with these liaison duties because it had direct access to the plant floor. Noel begrudgingly opted to take the smaller workstation, not the hallway office.

When doing so, however, she complained to Savage and Jason Heyboer, the HR director, about Brainard's behavior and asked them to "address[]" the "matter" "when possible." *Id.* In November, Heyboer visited the Pontiac plant to investigate. Mahle and another HR generalist told him that they had not witnessed Brainard act in a hostile manner toward Noel. And Heyboer explained to Noel that he had personally ordered the change in workstations so that all the talent acquisition specialists could sit together. During this conversation, Noel renewed her past concerns about the job fair and work schedule. This discussion gave Heyboer the impression that Noel "was holding on to past perceived slights and not able to move on from them." Heyboer Notes, R.19-13, PageID 611. He reassured her that the company "held her in high regard," and she appeared "willing to move forward." *Id.*

But the work environment did not improve. So Noel emailed Heyboer again in December that she still felt "uncomfortable" in the office. Email, R.19-16, PageID 620. For the first time, she complained that Brainard had "discriminated against" her "due to [her] race" by embarrassing her in front of coworkers. *Id.* Heyboer set up a virtual meeting with Noel to discuss this complaint. Yet Noel did not identify anything "new" that had "happened" since their last meeting. Heyboer Notes, R.19-13, PageID 611. So Heyboer told her that he "would discuss" things with her

coworkers. *Id.* Around this time, Noel also filed a formal discrimination charge with the Michigan Department of Civil Rights. Heyboer learned of the complaint later that day.

After the workstation change, Brainard started to notice that Noel often arrived to work late. She told Heyboer that she planned to counsel Noel on the issue. But Heyboer informed Brainard of Noel's discrimination charge and instructed her to avoid this meeting. Instead of a one-on-one conversation, Brainard held a group meeting to discuss attendance and timeliness concerns with her staff.

A misunderstanding in January 2023 left Noel feeling further slighted. Mahle would joke back and forth with another HR generalist. One of them would make a statement and the other would ask "what [are you] going to do about it"? Brainard Notes, R.19-17, PageID 625. The response would be: "I'm going to go home and cry" while making a "crying motion." Noel Dep., R.19-2, PageID 328. Noel overheard these jokes and confronted Mahle and the colleague. She believed that "they were talking about" her by claiming that she "was a crybaby because" she filed a discrimination charge. *Id.*, PageID 327, 329. They apologized. A "very upset" Mahle then approached Brainard, told her about the confrontation, and worried that Noel might file a charge against him. Brainard Dep., R.19-4, PageID 452. Mahle "did not understand" why Noel thought he had targeted her and felt "extremely uncomfortable" in the office. Brainard Notes, R.19-17, PageID 625. He added that he did not mean to offend Noel. Brainard found that nothing inappropriate had happened. But she warned Mahle to think twice about jokes in the office.

Two months later, Brainard drafted Noel's annual performance review. Brainard graded Noel as only partially meeting expectations. On the positive side, Noel had "typically met recruiting targets" in her prior role as a talent acquisition specialist. Review, R.19-18, PageID 629. On the negative side, Noel had missed 29 days of work and arrived late another 120 days in

her first year. Noel was also "still learning" her new HR generalist position. *Id.*, PageID 630. Of most concern, she had fallen behind on inputting 136 attendance points, making it more difficult for Challenge to discipline employees for attendance violations.

Savage and Brainard met with Noel to discuss this review. Savage explained that the company would have "terminated" Noel if she had been a floor worker with so many absences. Tr., R.19-19, PageID 707. Noel also admitted that she had fallen behind on inputting attendance points. She told Savage that she had been feeling "really drained and tired" in some afternoons and asked him if she could work from home when she felt this way. *Id.*, PageID 716. He responded that Challenge does not permit HR generalists to work remotely because their "primary function is interacting with [its] employees." *Id.* Because Noel was only partially meeting expectations, Savage and Brainard put her on a performance improvement plan. The plan did not reduce Noel's pay or affect any term of employment. But she opted not to sign the written form because she wanted to look it over more carefully.

Rather than sign the form later, Noel emailed Brainard and Savage a response to the proposed improvement plan. She defended her view that she had met expectations. She asked to see the records showing her repeated tardiness and thought that the company was penalizing her for using her 20 days of personal time. Turning to her duty to track attendance points, she opined that the department had been "behind" on the "task" before she started as an HR generalist. Resp., R.19-22, PageID 841. Lastly, she noted Mahle often worked from home on the weekends "to keep up" with his duties and found it unfair that the company would not let her work from home during the workday. *Id.*, PageID 839.

Savage and Brainard held a second meeting to discuss Noel's response. Among other things, Brainard explained to Noel that Mahle had taken "it upon himself" to work from home

7

because he had to "pick[] up all the slack" from Noel's inability to complete her tasks. Tr., R.19-21, PageID 773, 775–76. Once Brainard learned that Mahle had been doing so, she instructed him "to quit" taking work home. Brainard Dep., R.19-4, PageID 449. After a lengthy discussion, Noel asked to "postpone" this second meeting. Tr., R.19-21, PageID 832–33.

She met with Savage and Brainard two other times to discuss her improvement plan. Noel agreed to undergo "retraining" from Mahle on attendance-point tracking and to "meet regularly" with Savage for check-ins. Tr., R.19-23, PageID 860–61. But she still refused to sign the improvement plan.

Over the next three months, Noel took intermittent leave under the Family and Medical Leave Act for various health issues. She then took full-time leave in July. Noel resigned from Challenge on August 1, 2023. Noel's resignation letter claimed that Challenge had "constructively terminated" her employment by subjecting her to a hostile work environment and discrimination. Letter, R.19-25, PageID 892.

Noel sued Challenge under Title VII, 42 U.S.C. § 1981, and Michigan law. Her eight counts asserted four theories: race discrimination, sex discrimination, hostile work environment, and retaliation. The district court issued an oral ruling granting summary judgment to Challenge on all claims. The court rejected Noel's discrimination claims on two grounds. It held that she had failed to make out a prima facie case of discrimination because Challenge had not subjected her to an adverse employment action or treated similarly situated employees better. It also held that Noel had failed to show that Challenge made up its claim that she was performing poorly as a pretext for discrimination. The court next rejected Noel's retaliation claims because of her failure to establish an adverse action and to show a causal connection between the challenged personnel decisions and her discrimination charge. Lastly, the court rejected Noel's hostile work

environment claims both because the alleged harassment did not rise to the required level of harm and because Challenge had adequately responded to Noel's complaints. We review this summary-judgment ruling de novo. *See Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 388 (6th Cir. 2026).

II

Noel has asserted claims for race discrimination, sex discrimination, retaliation, and hostile work environment under Title VII, § 1981, and Michigan law. We have often evaluated employment claims under these laws using the same Title VII framework. *See, e.g.*, *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 575 (6th Cir. 2023); *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771–72 (6th Cir. 2018). Noel takes this approach on appeal and so has forfeited any argument that § 1981 and Michigan law follow different rules from Title VII. *See Hamm*, 167 F.4th at 392; *cf. Poplar v. Genesee Cnty. Rd. Comm'n*, 2025 WL 1950959, at *9 (6th Cir. July 16, 2025). We thus "may assume" that Title VII's "framework" applies to all three laws. *Hamm*, 167 F.4th at 392. Under that framework, Noel lacks enough evidence to obtain a jury trial on any of her claims.

A. Discrimination and Retaliation

We will address Noel's race discrimination, sex discrimination, and retaliation claims together because they all fail for the same reasons. These claims implicate two of Title VII's protections. First, Title VII's antidiscrimination provision makes it illegal "for an employer . . . to discharge" an employee "or otherwise to discriminate against" the employee "with respect to his compensation, terms, conditions, or privileges of employment, because of" the employee's race or sex. 42 U.S.C. § 2000e-2(a)(1). Second, Title VII's retaliation provision makes it illegal "for an employer to discriminate against" an employee "because he has opposed any practice" that Title VII prohibits "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *Id.* § 2000e-3(a).

These two provisions adopt different tests to determine whether an employer's personnel action falls within Title VII. The antidiscrimination provision allows an employee to challenge any action that causes "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). But the retaliation provision allows an employee to challenge only "materially adverse" actions that "cause[] 'significant' harm." *Id.* at 357 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Here, Noel's appeal leaves us unsure of the personnel actions that she challenges. Has she sued over the failure to be in the photo at the job fair? The failure to get her preferred work schedule? The negative performance review? The requirement to follow a performance improvement plan? Or the alleged constructive discharge? The district court held that none of these personnel decisions were actionable "adverse employment action[s]." Tr., R.29, PageID 1022–25; *see Muldrow*, 601 U.S. at 354–55 (discrimination); *Burlington*, 548 U.S. at 68 (retaliation). Yet Noel's appellate brief contains no argument or analysis challenging the court's adverse-action reasoning except for her claim that Challenge constructively discharged her. Appellant's Br. 38–39. We thus agree with Challenge that she has forfeited any claim that the other actions (including the denial of her work-from-home request, the performance review, and the subsequent improvement plan) could fall within Title VII's antidiscrimination and retaliation provisions in their own right. *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 881–82 (6th Cir. 2024). We also need not review the district court's holding that Challenge did not constructively discharge Noel because her discrimination and retaliation claims fail on *causation* grounds even if a jury could find such a constructive discharge.

In that respect, the antidiscrimination and retaliation provisions also set different causation rules. The antidiscrimination provision allows an employee to prove that an adverse action was

tainted by illegal race or sex discrimination if the employee's race or sex "was a *motivating factor* for [that action], even though other factors also motivated" it. 42 U.S.C. § 2000e-2(m) (emphasis added). The retaliation provision, by contrast, requires an employee to prove that the filing of a discrimination charge was a but-for cause of the challenged adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Still, we follow a similar framework at this summary-judgment stage for both types of claims. *See Rogers*, 897 F.3d at 771–72. The precise framework depends on whether an employee has introduced direct or circumstantial evidence of discrimination or retaliation. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648–49 (6th Cir. 2012); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). We have defined "direct evidence" as evidence that would not require "any inferences" that discriminatory or retaliatory animus tainted an action. *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (citation omitted).

Noel alleges that she has introduced this direct evidence here, at least for her race-discrimination claim. She points to her testimony that Brainard told her "not to hire people from Pontiac" because Brainard wanted "different candidates" to consider. Noel Dep., R.19-2, PageID 247, 249. But this statement does not qualify as direct evidence. For one, the statement does not relate to any action taken against Noel. *See Williams v. Memphis Light, Gas & Water*, 2024 WL 3427171, at *4 (6th Cir. July 16, 2024); *cf. Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 703 (6th Cir. 2016). For another, the statement would "require" a jury to make "additional inferences to tie" it to racial discrimination. *Richardson*, 836 F.3d at 704. The jury would have to infer that Brainard wanted to avoid Pontiac applicants because of the city's alleged demographics and not for a race-neutral reason. Those additional inferences make the evidence

11

indirect. Noel thus has produced only circumstantial evidence to prove her discrimination and retaliation claims.

As a result, we must apply the burden-shifting approach that governs claims relying on circumstantial evidence. *See Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 548 (6th Cir. 2025) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under this approach, Noel must first establish "a prima facie case" of discrimination or retaliation. *Rogers*, 897 F.3d at 772. If she does, Challenge must identify "a legitimate, nondiscriminatory [or nonretaliatory] reason" for its treatment of Noel. *Id.* (citation omitted). If it does, Noel must rebut the alleged neutral reason by offering evidence that the reason was pretext for discrimination (because of Noel's race or sex) or retaliation (because of Noel's discrimination charge). *See id.*

We can jump immediately to the third step—pretext—because Challenge identified a neutral, nondiscriminatory and nonretaliatory reason for its actions. To establish her constructive discharge, Noel relies primarily on the performance improvement plan. But the company placed her on this plan because she missed many days of work, arrived late even more days, and fell behind in inputting attendance points for the production-floor employees. *See Bashaw*, 130 F.4th at 550–51; *Pio v. Benteler Auto. Corp.*, 2022 WL 351772, at *6 (6th Cir. Feb. 7, 2022). That backlog undermined the plant's "efficient operations" by preventing Challenge from disciplining these floor employees for attendance violations. Savage Decl., R.19-9, PageID 595.

The burden thus shifts to Noel to establish that Challenge made up this neutral reason to cover up its racist, sexist, or retaliatory motives. To do so, she mainly relies on three common methods for proving pretext. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). *First*, Noel argues that Challenge's criticisms of her performance had "no basis in fact," *id.*, because they were "inaccurate and ignored her successes," Appellant's Br. 35. She is mistaken.

12

To start, she herself admitted during her performance review that she had fallen behind on inputting the attendance points. *See Most v. BWXT Nuclear Operations Grp., Inc.*, 743 F. App'x 664, 669 (6th Cir. 2018). Next, Challenge's objective card-swipe records showed that she arrived late dozens of times. And while she speculated during her deposition that she might have *sometimes* arrived on time despite a late card swipe, this evidence would not allow a reasonable jury to find that her repeated tardiness "never" happened. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888–89 (6th Cir. 2020); *see Cecil v. Louisville Water Co.*, 301 F. App'x 490, 498 (6th Cir. 2008). The undisputed evidence also shows that her absences from work (29) exceeded her allotted personal days (20). Finally, Challenge did not ignore Noel's accomplishments. To the contrary, it acknowledged in her performance review that she had met her earlier duties as a talent acquisition specialist. So no reasonable jury could find that Challenge's balanced review of her performance lacked a basis in fact. *See Hrdlicka*, 63 F.4th at 569.

*Second*, Noel argues that the close timing between her discrimination claims and the performance improvement plan shows that her attendance and performance issues "did not actually motivate" the plan. *Dews*, 231 F.3d at 1021. After she filed a discrimination charge, she says that Challenge "[lay] in wait" for her to make a mistake that it could use to retaliate against her for that charge. Appellant's Br. 35. Yet Noel has not identified sufficient evidence to allow a reasonable jury to treat her ongoing attendance and performance issues as "'trumped up' charges" that Challenge would not have raised but for her discrimination claims. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009). As we have said, those charges described tangible problems. The date when Challenge raised the charges also does not raise a valid inference of retaliation. We have held that the "temporal proximity" between protected activity and an adverse action will "rarely" create a genuine issue of material fact by itself. *Howard v. Cherokee Health Sys.*, 2025

WL 2506651, at *6 (6th Cir. Sept. 2, 2025) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)). And here, several "months" elapsed between when Noel filed the charge (December 2022) and when Challenge imposed the performance improvement plan (March 2023). *Id.* This months-long delay far exceeds the one-day gap between the employee's protected activity and the employer's adverse action in the case that Noel cites. *See Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 506 (6th Cir. 2014).

In that case, moreover, the employee introduced other evidence to establish retaliatory animus apart from the short time gap. *See id.* Here, by contrast, the other evidence refutes the claim that Noel's discrimination charge caused Challenge to criticize her work. For example, Brainard had flagged Noel's attendance issues to Heyboer *before* she learned of the discrimination charge. The objective card-swipe records likewise confirm that Noel's attendance issues started before, not after, she filed that charge. Brainard also attempted to address the attendance problems in a subtle way through a group HR meeting. Yet Noel's attendance problems remained. *See Most*, 743 F. App'x at 669. So no reasonable jury would find it "*more* likely" that Challenge harbored an improper motivation when criticizing Noel's work. *Id.* (citation omitted).

*Third*, Noel claims that her attendance and performance problems did not "warrant" Challenge's actions because Mahle committed a similar policy violation (taking work home) without facing punishment. *Dews*, 231 F.3d at 1021. True, Mahle had been "taking" work "home" on weekends because he had spent a lot of time getting the attendance-point tracking up to date and Noel had let it "fall behind" again. Brainard Dep., R.19-4, PageID 449, 464. Yet Brainard did reprimand Mahle when she learned this fact and told him "to quit" working from home. *Id.* No evidence suggests that he violated this order. Besides, Mahle's violation looks nothing like Noel's. *See Maben v. Sw. Med. Clinic*, 630 F. App'x 438, 446 (6th Cir. 2015). He went above

and beyond to perform someone else's duties outside the normal business week; she could not complete her own duties while routinely showing up late (if at all). And because "they acted differently," it makes sense that Challenge would "treat[] them differently[.]" *Brown v. Excelda Mfg. Co.*, 726 F. App'x 445, 448 (6th Cir. 2018). Noel and Mahle did not engage in the "same type of" policy violation, so no reasonable juror could find pretext in Brainard's failure to punish Mahle more severely. *Miles*, 946 F.3d at 894–95.

*Fourth*, and finally, Noel argues that a reasonable jury could reject Challenge's reasons for its conduct because it engaged in "sham investigations" of her complaints. Appellant's Br. 36. Yet Challenge diligently investigated those complaints. As for her job-fair complaint, Savage spoke with Noel, Brainard, Kote, Mahle, and representatives in corporate marketing. He confirmed that Brainard did not "intentionally" send Noel home so that she would miss a photo opportunity. Savage Decl., R.19-9, PageID 594. Likewise, Heyboer investigated Noel's concerns about her workstation when she became an HR generalist, explaining to her that he had ordered the move to keep the talent acquisition specialists together. And Brainard investigated Noel's claim that Mahle mocked her as a crybaby for filing a discrimination charge. She found that Noel's concerns arose from a simple misunderstanding. All told, Challenge's responsiveness to Noel's many complaints undermines her claim that the company acted with hidden discriminatory or retaliatory motives.

\* \* \*

Taken together, Noel's pretext arguments fall short. No reasonable juror could conclude that anything other than her attendance and performance issues motivated Challenge's actions. And contrary to her claim, there is nothing "troubling" about the district court's conclusion that she failed to create a genuine issue of material fact. Appellant's Br. 15. For the most part, she

seeks a jury trial based on her subjective beliefs about Challenge's motives. But once an employer provides a neutral reason for an adverse employment action, employees generally cannot obtain a jury trial simply "by testifying to their 'personal belief' that they were discriminated against" because they "usually lack *personal knowledge* about the employer's intent." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 841 (6th Cir. 2021) (quoting *Watson v. City of Cleveland*, 202 F. App'x 844, 854 (6th Cir. 2006)). So Noel's subjective beliefs about Challenge's motive do not suffice to withstand summary judgment without some evidence of invidious intent. That evidence is missing here.

## B. Hostile Work Environment

Title VII's ban on "race" and "sex" "discriminat[ion]" bars more than discrete personnel actions (such as a failure to promote or a termination). 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that it also prohibits the creation of a race- or sex-based "hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). To prove a hostile work environment, employees must establish several elements. *See Bivens v. Zep, Inc.*, 147 F.4th 635, 642 (6th Cir. 2025). As relevant here, they must show both that they suffered "sufficiently severe harassment" and that their employer "engaged in the kind of action or inaction that" would make it liable for this harassment. *Hamm*, 167 F.4th at 388–89. The proof required to hold an employer liable turns on a question about the harassers: were they supervisors or coworkers? *See id.* at 389. Coworker harassment requires employees to prove that an employer knew of the harassment and failed to stop it. *See Vance*, 570 U.S. at 427. Supervisor harassment flips the burden to the employer to prove an affirmative defense. *See id.* at 428–30. An employer must show that it adopted "reasonable" processes to deter and remedy the harassment and that the employee "unreasonably" failed to take advantage of the processes. *Id.* at 430.

The district court rejected Noel's harassment claims based on these severity and employer-liability elements. It first held that no reasonable jury could find that Brainard or Noel's coworkers inflicted "sufficiently severe or pervasive" harassment on her. Tr., R.29, PageID 1031–33 (quoting *Harris*, 510 U.S. at 21). It next held that no reasonable jury could find Challenge liable for any harassment by Brainard or Noel's coworkers. *Id.*, PageID 1033–34. The court reasoned that Challenge adopted a "reasonable reporting policy" to prevent abuse and that the company "promptly" looked into Noel's complaints about Brainard. *Id.*, PageID 1033. It added that Challenge had no basis to know of Noel's concerns about coworker harassment because "she never reported these concerns." *Id.*, PageID 1034. Because Noel must prove both elements—severity and employer liability—to establish her hostile-work-environment claims, she must show that the district court erred in both respects.

We opt to affirm based on the employer-liability element alone. When a district court rejects a claim on two grounds and an appellant disputes only one of the grounds, the appellant forfeits "any challenge to the unbriefed ground." *Blick*, 105 F.4th at 884. This rule applies here. On appeal, Noel challenged only the district court's holding that she failed to show sufficiently severe harassment. *See* Appellant's Br. 25–29. Her opening brief offers no theory to hold Challenge liable for the harassment even if it rose to the required level. She has thus "forfeited any challenge" to this "independent" reason for the district court's rejection of her claim. *Blick*, 105 F.4th at 884. So we can resolve Noel's appeal of her hostile-work-environment claims on forfeiture grounds without reaching the merits of either element. *See id.*; *White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 854 (6th Cir. 2010).

We affirm.